**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

———————————

PUEBLO OF ZUNI, on behalf of itself
and all others similarly situated,

      Plaintiff,

v.                                            Civil No. 01-1046 WJ/WPL

UNITED STATES OF AMERICA;
TOMMY THOMPSON, Secretary of t he
United States Department of Health and
Human Services; and
MICHAEL H. TRUJILLO, Director of the
Indian health Service, United States
Department of Health and Human Services,

      Defendants.

**MEMORANDUM OPINION AND ORDER DENYING
CLASS CERTIFICATION AND DENYING MOTION TO CREATE SUB-CLASSES
AND APPOINT COUNSEL FOR SUB-CLASS**

THIS MATTER comes before the Court upon Plaintiff's Motion for Class Certification and Approval of Class Notice, filed June 6, 2006 (**Doc. 280**) and an Application under Rule 23(g) for Creation of Sub-Classes and for Appointment as Class Counsel for the Rate-Making Claims, filed on July 20, 2006 by Attorneys Michael Gross & J.E. Gallegos (**Doc. 297**).   Having considered the parties' briefs and the applicable law, including counsel's oral arguments at a hearing on this matter, I find that Plaintiff's  motion is not well-taken and shall be denied. The denial of Plaintiff's motion renders the motion filed by Mr. Gross and Mr. Gallegos moot, and it shall be denied on that basis.

# BACKGROUND

This case (the "Zuni" case) is a putative class action case filed by Plaintiff Pueblo of Zuni ("Plaintiff") which seeks damages against the United States Government ("Government"[1]) for its alleged failure to pay the full contract amounts specified in contracts between Native American Tribes or Pueblos (collectively, "tribes") and the Indian Health Service ("IHS") that were awarded under the Indian Self-Determination and Education Assistance Act ("ISDA"), 25 U.S.C. § 450 et seq. In the Zuni case, these ISDA contracts provide that Zuni Pueblo members will deliver health care services to other Zuni Pueblo members that would otherwise be provided to members by IHS. Plaintiff seeks damages for the Government's underpayment of contract support costs to tribes for ISDA contracts in fiscal years dating back from 1993 to the present. The Amended Complaint was filed on December 12, 2001 (Doc. 5). It alleges various theories of claims flowing from the Government's alleged breach of contract and violation of the ISDA, and requests both declaratory relief and monetary damages.

A.      Statutory Background

The ISDA's stated purpose is to allow tribes to directly operate their own federal programs. Under the ISDA, a tribe and the Secretary of Interior enter into a "self- determination contract," which incorporates the provisions of the model contract contained in the ISDA text. See 25 U.S.C. § 450l(a), (c). The ISDA specifies that the Government must pay a tribe's costs, including administrative expenses. 25 U.S.C. §§ 450j-l(a)(1) and (2). Administrative expenses include: (1) the amount that the agency would have spent for the operation of the program, had

---

[1]Reference to "Government" herein includes the United States Government, along with the named federal agencies, Health and Human Services, and Indian Health Services, as well as the directors of these agencies all of whom are named Defendants.

the agency itself managed the program, and (2) contract support costs. § 450j-1(a)(1) & (2).  The ISDA defines "contract support costs" as other "reasonable costs" that a federal agency would not have incurred, but which nonetheless "a tribal organization" acting "as a contractor" would incur "to ensure compliance with the terms of the contract and prudent management." § 450j-1(a)(2).

Contract support costs can include indirect administrative costs, such as special auditing or other financial management costs, § 450j-1(a)(3)(A)(ii); direct costs, such as workers' compensation insurance, § 450j-1(a)(3)(A)(i); and certain startup costs, § 450j-1(a)(5). Most contract support costs are indirect costs "generally calculated by applying an 'indirect cost rate' to the amount of funds otherwise payable to the Tribe." Cherokee Nation of Okla. v. Leavitt, 543 U.S. 631, 635 (2005)("Leavitt").  Funding of indirect contract support costs is based on a variety of factors, including specific terms of each negotiated ISDA contract, each tribe's annual indirect cost rate, the amount of funding made available by Congress in the annual IHS appropriation and IHS policies and procedures for the calculation and distribution of indirect contract support costs.  The Zuni case arises, in part, from a dispute regarding the funding of indirect contract support costs under the individual self-determination contracts.

Prior to 1998, Congress provided IHS with a lump-sum appropriation for the majority of its operations, also providing recommendations on the amount that IHS should expend on contract support costs.[2]  Starting in the fiscal year 1998 appropriation, Congress explicitly limited

---

[2]  The Government's memorandum brief at 5-6 contains citations to pertinent supporting legislative documents. See , e.g., Dep't of the Interior & Related Agencies Appropriations Act, 1994, Pub. L. No. 103-138, 107 Stat. 1379, 1408 (1993) (appropriating a lump-sum appropriation for IHS for fiscal year 1994: "[t]hat not to exceed $91,223,000 of the funds in this Act shall be available for payments to tribes and tribal organizations for indirect costs associated

the amount that IHS could expend on contract support costs by imposing a "cap" directly in the appropriations act.

In March, 2005, the United States Supreme Court held that IHS could not defend against a claim for breach of an ISDA contract on the basis of insufficient congressional appropriations, "where Congress merely appropriates lump-sum amounts without statutorily restricting what can be done with those funds. . . ." Leavitt, 543 U.S. 631, at 637. However, the Supreme Court in that case did not address the liability of the Government when there is a capped appropriation for the total amount of funds owed to all ISDA contracts.

B.      Plaintiff's Claims

Plaintiff seeks class certification for four "Claims" (actually groups of claims) which are described as follows:

(1)     Claims for contractual damages relating to contracts in effect after 1995, based on the agency's denial of full funding of contract support cost requirements associated with "new or expanded" contracts;

(2)     Claims for contractual damages relating to contracts in effect after 1995, based on the agency's denial of full funding of contract support cost requirements associated with "ongoing" contracts;

(3)     Claims for contractual damages for damages relating to contracts in effect after 1995, based on the agency's use of a methodology for determining indirect administrative contract support costs that undercalculates those costs; and

(4)     Claims falling within Claims 1, 2 and/or 3, but for contracts in effect for years 1993 and 1994 (that is, before the congressional cap went into effect).

---

with contracts or grants or compacts authorized by the Indian Self-Determination Act. . . ."); H.R. Rep. No. 103-158, at 100 (1993) (recommending allocation of the lump-sum appropriation, including an allocation for contract support costs: "[t]he Committee recommends an increase of $26,000,000 to fund fully contract support costs as required by law."), S. Rep. No. 103-114, at 107 (1993) (recommending an increase in appropriations and expressing concern regarding the "shortfall in contract support").

Claims 1 and 2 can be described as "shortfall" claims. In this category of claims, Plaintiff asserts that IHS allegedly failed to pay the full amount of Plaintiff's need for indirect contract support costs, as calculated under its indirect cost rate. Shortfall claims refer to the difference between what IHS estimated as the amount of contract support costs each contractor believed was necessary to run its ISDA programs, and the amount that IHS was able to award for contract support costs. Claim 3 represents "miscalculation" or "rate-making" claims. This category of claims alleges a failure on the agency's part to make adjustments in calculating the full amount of costs associated with the IHS programs under contract. Under a miscalculation theory, Plaintiff alleges that IHS should have awarded indirect contract support costs only after first upwardly adjusting Plaintiff's indirect cost rate in effect in that year to account for the alleged underpayment of indirect contract support costs in connection with other, non-ISDA federal contracts. As part of the miscalculation claims, Plaintiff also alleges that the agency erroneously and purposely attributed over-recoveries to contractors by basing its allotments for the following year on the fiction that the contractor had recovered all of its indirect cost pool from every program source, even if the contractor had actually experienced an under-recovery (referred to as "carry-forward" claims). This resulted in the agency's failure to credit upward adjustments to contractors who had not received the full amount of indirect costs. Claim 4, which includes both shortfall and miscalculation claims, is separated from the other Claims because of some differences between the contracts in effect in 1993 and 1994, and those in subsequent years, after Congress mandated a Model Contract in 1994. The Amended Complaint states seven causes of action, which all fall into Claims 1 through 4.

The landscape of Plaintiff's claims is further complicated by time categories. Claims in

"Lump Sum Years" arose in fiscal years before Congress limited the amount of funds available to IHS to pay the contracts.  Claims for "Cap Years" arose in fiscal years after 1998, when Congress placed an appropriations cap on the amount that IHS could expend on contract support costs.

C.   Related Cases

There are at least two other related cases having a connection with the District of New Mexico and a connection, albeit tenuous, with this litigation.  One is Ramah Navajo Chapter v. Lujan, 112 F.3d 1455 (10th Cir. 1997), on remand to Ramah Navajo  Chapter v. Babbit, 50 F.Supp.2d 1091 (D.N.M. 1999).   This case was filed in this district some seventeen years ago as Civil No. 90-0957 LH/WWD and asserted claims of underpayment on contracts between a tribal organization of the Navajo Nation and the Bureau of Indian Affairs ("BIA").   The lawsuit initially alleged miscalculation claims, and shortfall claims which arose prior to 1994 (the year in which Congress placed an appropriations cap on the amount that the BIA could expend on contract supports costs).  These claims settled after the Tenth Circuit reversed a grant of summary judgment to the Government.[3]

The complaint was then amended to include shortfall claims for fiscal years after 1994.  The Ramah court denied plaintiff's motion for partial summary judgment regarding the shortfall claims for Cap Years, finding that the United States Supreme Court's decision in Leavitt did not

_____

[3]  The Tenth Circuit held that in allocating funds for indirect contract costs, the Department of Interior may not reduce funding of self-determination contracts based on failure of other agencies to pay their indirect costs.  The Court found that the BIA was wrong to include in its direct cost base all funds that were received by a tribe in a given fiscal year, even funds not received in connection with a self-determination contract.  See, Ramah Navajo Chapter v. Lujan et al., 112 F.3d 1455 (10th Cir. 1997).

apply to those claims because the contracts addressed in <u>Leavitt</u> arose prior to the imposition of the appropriations cap.  <u>See</u>, Civil 90-957 LH/WWD, Doc. 1042, filed August 31, 2006. Settlement negotiations are ongoing, and the case is still pending.

Another case, <u>Tunica-Biloxi Tribe of La. v. United States</u>, Civ. No. 02-2413(RBW) (D.D.C.), was originally filed in the District of New Mexico, but was re-filed in the District of Columbia following an unfavorable decision by the Tenth Circuit in <u>Cherokee Nation and Shoshone-Paiute Tribes v. Thompson</u>, 311 F.3d 1054 (10th Cir. 2002).  When the United States Supreme Court reversed the Tenth Circuit in <u>Cherokee Nation v. Leavitt</u>, 543 U.S. 631,125 S.Ct. 1172 (2005), the <u>Tunica-Biloxi</u> plaintiffs sought to intervene in the <u>Zuni</u> case.  This Court denied the motion to intervene (Doc. 145) and the <u>Tunica-Biloxi</u> case remains in the District of Columbia for pretrial and trial purposes.

The question to be addressed here is whether the <u>Zuni</u> case meets the requirements of Rule 23 of the Federal Rules of Civil Procedure, such that the putative plaintiffs in the <u>Zuni</u> case should be joined in a class action.  Plaintiff contends that all of Rule 23's prerequisites have been met, while the Government contends that none have been met.   The Court takes no issue with the requirements regarding numerosity or fair and adequate representation of the class by present counsel.  However, the other requirements are not satisfied, and class certification shall be denied. The denial of class certification necessarily moots the motion by Mr. Gross and Mr. Gallegos to create a sub-class and appoint them as counsel for that sub-class.

**DISCUSSION**

The Government raises a threshold issue of jurisdiction, contending that the existence of unexhausted claims among the putative class members mandates a denial of class certification.

**I.      Jurisdiction & Exhaustion**

The basis for the Government's jurisdictional argument is that the waiver of sovereign immunity contained in the ISDA for monetary claims against the Government is conditioned on compliance with the Contracts Disputes Act ("CDA"), 41 U.S.C. §§ 605(a). The CDA applies to self-determination contracts under the ISDA. 25 U.S.C. § 450m-1(d).  If the exhaustion requirement under the CDA is jurisdictional and mandatory, then these terms and conditions are prerequisites to this Court's subject matter jurisdiction over the Plaintiff's and all other putative plaintiffs' claims.

The ISDA  provides in part that:

[t]he United States district courts shall have original jurisdiction over any civil action or claim against the appropriate Secretary arising under this subchapter and, subject to the provisions of subsection (d) of this section and concurrent with the United States Court of Claims, over any civil action or claim against the Secretary for money damages arising under contracts authorized by this subchapter. . . .

25 U.S.C. § 450m-1(a).  The ISDA also provides that the CDA "shall apply to self-determination contracts." 25 U.S.C. § 450m-1(d). The CDA provides a mandatory administrative exhaustion scheme, referred to as "presentment," which is applicable to contract disputes between government contractors and the United States.  Under the CDA, all claims by a contractor against the Government relating to a contract "shall be in writing and shall be submitted to the contracting officer for decision."  41 U.S.C. § 605(a); see also 25 C.F.R. §§ 900.215- 900.230.

The Court previously granted the Government's motion to dismiss certain claims which

Plaintiff had not submitted for presentment. Specifically, I found that Plaintiff had not exhausted: (1) all claims for funding of its ISDA contracts in fiscal years after 1998; and (2) claims for additional funding of its ISDA contracts in fiscal years after 1995 which are based on IHS' failure to adjust Plaintiff's indirect cost rate to take into account the full amount of costs associated with the IHS programs under contract (miscalculation claims). I concluded that Plaintiff had properly exhausted claims presented under a shortfall theory for fiscal years 1993-1998, as well as claims under a miscalculation theory only for fiscal years 1993-1995. See, Doc. 330 at 23-24.

The Government now raises the same jurisdictional argument with regard to the claims of the putative class members, and once again Plaintiff contends that the language in § 450m-1(d) of the ISDA statute allows tribes to bypass the presentment requirement. I have given the issue further thought and analysis, and find no legal justification to modify my previous ruling that exhaustion under the CDA is mandatory and jurisdictional. Accordingly, there is no legal basis for a waiver of this requirement for Plaintiff or any putative class member, given the express mandate for presentment with the statutory language. See, Avocados Plus Inc. v. Veneman, 370 F.3d 1243, 1247-48 (C.A.D.C.,2004) (if statute mandates exhaustion, court cannot excuse it) (citing Shalala v. Illinois Council on Long Term Care, 529 U.S. 1, 13 (2000)); cmp., McGraw v. Prudential Ins. Co. of America, 137 F.3d 1253, 1263 (10th Cir. 1998) (where ERISA statute did not specifically require exhaustion of remedies, court have allowed waiver where an administrative remedy would be inadequate, and where they would be futile). Thus, the existence of unexhausted claims within the claims of the putative class remains a jurisdictional defect, precluding class certification.

As an alternative to a finding that nonexhaustion precludes class certification, Plaintiff

suggests a narrowing of the class to include only putative class members who have exhausted

their claims.  Rather than resolving the jurisdictional issue, this would provide only a stopgap

measure.  In reality, this measure would open the door to a host of other problems related to the

Rule 23 requirements.  It is certain that putative plaintiffs who had not exhausted claims would

still seek to join the class by raising separate arguments of waiver or equitable tolling – which

would leave the jurisdictional issue exactly where it started.  A narrowing of class definition

would ultimately be ineffective in resolving the jurisdictional glitch.  The Court would still have to

make individual assessments and decisions regarding exhaustion and equitable tolling for each of

the contracting tribes and their unexhausted claims as a threshold matter.

## II.    Class Certification - Threshold Requirements

In order to be considered for certification, a proposed class must meet certain threshold

requirements that a defined or identifiable class exists and that the class representatives are

members of the class.  Harrington v. City of Albuquerque, 222 F.R.D. 505 (D.N.M.,2004) (citing

Stambaugh v. Kansas Dep't of Corrections, 151 F.R.D. 664, 671 (D.Kan.1993).  Plaintiff

proposes the following class definition:

> All Indian Tribes and Tribal organizations that have contracted with the Indian Health
> Service under the Indian Self-Determination Act, 25 U.S.C. §§ 450-458aaa-18, at any
> time from fiscal year 1993 to the present (including FY 2005).

The Government contends that the proposed class definition is overbroad, and thus an

identifiable class cannot be ascertained from this group.  Part of this argument is based on the fact

that the definition of the class, as proposed by Plaintiff, arguably includes tribes which may not

have exhausted their claims.  This would preclude their ability to be a part of the class.  The

proposed definition is also broad enough to include those tribes which do not allege any injury

caused by the Government.  This argument has merit.  Only those tribes which sustained injuries are properly included in a class definition.  See, Daigle v. Shell Oil Co., 133 F.R.D. 600, 604 (D.Colo.,1990).

While the class definition could be narrowed, other questions would need to be resolved before a class becomes more identifiable, in addition to the exhaustion issue. The significance of releases signed by some tribes would have to be addressed, and collateral estoppel may bar some claims by tribes which have litigated these claims against IHS.  The Court would be required to conduct numerous mini-trials on these issues before being able to identify a class.

The proposed class definition is overbroad and unworkable, as proposed by Plaintiff. Most likely, it could be narrowed to overcome this threshold hurdle, but class certification still would be precluded by other difficulties related to the Rule 23(a) prerequisites.

### III.    Class Certification: Rule 23(a) Prerequisites

The decision to grant or deny certification of a class belongs within the discretion of the trial court.  Reed v. Bowen, 849 F.2d 1307, 1309 (10th Cir.1988).  Class certification must meet the requirements of Fed. R. Civ. P. 23.  Pursuant to Rule 23(a), a class must meet **all** of the following four requirements: (1) a numerosity requirement in that the class is so numerous that joinder of all members is impracticable, (2) there must be common questions of law or fact to the class, (3) the claims or defenses of the representative party must be typical of the class, and (4) the representative party must fairly and adequately represent the interests of the class.  If all four of the Rule 23(a) requirements are met, the class must then meet one of the requirements of Rule 23(b) in order for the class action to be maintainable and in the Zuni case, Plaintiff seeks certification under the standard in Rule 23(b)(3) which requires a finding that common issues

11

predominate over individual ones and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Plaintiff bears the burden of demonstrating that all prerequisites for class designation are met.  Rex v. Owens ex rel. State of Okla, 585 F.2d 432, 435 (10th Cir. 1978).

Class action certification matters are committed to the sound "discretion of the trial court." Anderson v. City of Albuquerque, 690 F.2d 796, 799 (10th Cir. 1982).  Uncertainties should be resolved "in favor and not against the maintenance of the class action, for it is always subject to modification should later developments during the course of the [litigation] so require." Esplin v. Hirschi, 402 F.2d 94, 99 (10th Cir. 1968) (finding district court erred in not certifying securities class action); Harrington v. City of Albuquerque, 222 F.R.D. 505, 508-509 (D. N.M. 2004) (citing Esplin, 402 F.2d at 99) (granting class certification in civil rights action challenging mandatory union share deductions).  However, the liberal interpretation a district court gives Rule 23 does not negate a court's duty also to "engage in its own 'rigorous analysis' of whether 'the prerequisites of Rule 23(a) have been satisfied.'"  Shook v. El Paso County, 386 F.3d 963, 968 (10th Cir. 2004) (quoting Gen. Tel. Co. of the Southwest v. Falcon, 457 U.S. 147, 161 (1982)). While class determination "generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action," the Court must "carefully apply the requirements of Rules 23(a)." Shook, 386 F.3d at 971 (citing Falcon, 457 U.S. at 160).

A.    Numerosity

Under Rule 23(a)(1), in order to meet the numerosity requirement, the class must be so numerous that joinder of all members is impracticable.  To satisfy this requirement, the plaintiffs need not show that joinder of all members is impossible, only that it is impracticable.  O'Neil v.

Appel, 165 F.R.D. 479, 488 (W.D.Mich.1996). Nor is it necessary that the plaintiffs identify the exact number of class members involved; courts have often used common sense assumptions to support a finding of numerosity. Ditty v. Check Rite, Ltd. 182 F.R.D. 639, 641 (D.Utah,1998); Alvarado Partners, L.P. v. Mehta, 130 F.R.D. 673, 675 (D.Colo. 1990) ( The determination of whether joinder of the members is impractical turns on the facts of each case, not solely on the number of members).

A number of factors are relevant in determining whether joinder is impracticable, including the class size, the geographic diversity of class members, the relative ease or difficulty in identifying members of the class for joinder, the financial resources of class members, and the ability of class members to institute individual lawsuits. Colorado Cross-Disability Coalition v. Taco Bell Corp.,184 F.R.D. 354, 357 (D.Colo.,1999).

According to evidence submitted in the pleadings and at the hearing, the number of tribes contracting with IHS experiencing some type of shortfall is well over 200, and these tribes are located all over the United States. While some of these putative class members might lack the financial resources to initiate their own lawsuits, the reality is that a large number of these contracting tribes are litigating their claims against the Government. However, despite the number of tribes proceeding to litigation on their own, I find that Plaintiff  has met the numerosity requirement.

B.    Commonality

The second Rule 23(a)(2) prerequisite is that there must be common questions of law or fact to the class.  The Plaintiff must establish that at least a single issue is common to all members in the class.  In determining whether the commonality requirement has been fulfilled, either

13

common questions of law or fact presented by the class will be deemed sufficient.[4] Factual differences in the claims of the class members should not result in a denial of class certification where common questions of law exist. Milonas v. Williams, 691 F.2d 931, 938 (10th Cir. 1982). Not every issue must be common to the class provided that the claims of the plaintiffs and other class members are based on the same legal or remedial theory.  Taco Bell, 184 FRD at 359.

Plaintiff contends that commonality exists because the claims are based on a single statute that has been incorporated into each contract and that the contracts are materially identical after 1994 because they are all based on the Model contract which Congress mandated in 1994. Plaintiff also contends that IHS "Circulars" or policies were applied in a uniform and consistent manner to all the contracts, resulting in chronic underfunding of contract support costs owed under the contracts.

Some discussion about these IHS Circulars is appropriate, since Plaintiff bases much of its Rule 23 arguments on IHS' use of these policies to determine indirect cost rates.  The ISDA provides no mandate or guidance regarding what accounting methods should be used to determine the actual amount of indirect contract support costs to be funded in a contract.  The IHS developed the Circulars as a policy or guideline for how the annual appropriation should be allocated among the tribes, and for calculating the indirect cost rates.  The purpose of these Circulars was to create uniformity within IHS in dealing with accounting procedures for tribes.

---

[4] The "commonality" and "typicality" requirements of Rule 23(a) "tend to merge."  Dukes v. Wal-Mart, Inc., 474 F.3d 1214, 1232 n.10 (9th Cir. 2007) (citing General Tel. Co. of the Southwest v. Falcon, 457 U.S. 147, 157 n.13 (1982)).  However, "each factor serves a discrete purpose. Commonality examines the relationship of facts and legal issues common to class members, while typicality focuses on the relationship of facts and issues between the class and its representatives."  474 F.3d at 1232 n.10 (citing Newberg on Class Actions, § 3:13 at 317).

In the formula used by IHS, the indirect cost rate is the ratio of dividing the total amount of reasonable indirect costs by the tribe's total program funding that benefits from those indirect costs ("direct cost base").  The direct cost base includes several funded programs.  The ratio of those two numbers is applied to each program in the direct cost base to determine the maximum amount of costs that could be allocated to each program.  The general idea of the calculation is that the higher the denominator (or the more funding in the denominator), the smaller the indirect cost ratio that would be applied, resulting in a smaller amount of indirect contract support costs funding.  IHS's use of these accounting methods forms the basis for Plaintiff's allegations in the miscalculation claims.[5]

Plaintiff argues that the IHS' use of Circulars in calculating indirect cost rates for tribes meets the commonality requirement, and that any differences among the contracts goes only to damages.  IHS claims that the Circulars were developed with tribal participation, and the methodologies used to calculate indirect contract support costs were negotiated and agreed to by the different tribes, working with the "cognizant agency" in charge of negotiating indirect contract support costs.[6]  The Government raises several arguments as to why Plaintiff's claims do not meet the commonality requirement, notwithstanding the existence of the Circulars, which the Court finds convincing.

The Government contests liability because of the individuality of the contracts with the individual tribes.  With the exception of the mandatory model contract provisions, the terms and

---

[5]  The Tenth Circuit in <u>Ramah</u> rejected the use of the indirect cost method which the BIA had applied to the contracts at issue in that case.

[6]  In this case, IHS is the funding agency for ISDA contracts, but the Department of the Interior is the "cognizant agency" that issues the indirect contract support costs.

conditions of the ISDA contracts and annual funding agreements vary greatly.  The Government
provides evidence in the form of sworn testimony and other exhibits to support its position that,
despite the existence and use of the Circulars to provide guidance for calculating indirect contract
support costs, there is little the contracts have in common with each other. Not all tribal
contractors have indirect cost rates.  Some tribes do not incur indirect costs at all. Some tribes
negotiate directly with IHS for indirect-type costs, and others secure indirect contract support
costs funding through other methods.  Of those tribal contracts with  indirect cost rates, the
methodologies used to arrive at those rates were subject to negotiation, including: different ways
of categorizing costs, negotiation for different types of rates and use of more than one rate (which
in turn impacts the programs that are in the direct cost base).

　　　　Negotiations that addressed determination of indirect contract support costs occurred at
two levels.  One round of negotiations took place between each tribe and the cognizant agency to
develop and agree on an equitable indirect cost rate, and a second round with IHS to determine
the amount of contract support costs needed and available in order to run the programs under
contract.  Because of the individuality of the negotiations, the defenses to each contract are
individualized as well.  Different amounts were agreed to for each contract, and different amounts
were paid.  Some tribes signed releases, and others specifically agreed to forego immediate
payment of contract support costs with the request for contract support costs deferred in
accordance with the Circulars.

　　　　Plaintiff does not deny that these negotiations took place, nor has it shown that the
contracts among the numerous tribes contain the same material terms and conditions.  Plaintiff
simply adheres to the position that the existence and use of the Circulars in any fashion,

establishes a common issue among the putative class plaintiffs.  Plaintiff argues that this case

concerns what contract support costs amounts are alleged by the tribes to be necessary to run

their programs and what the Government actually paid.  Plaintiff contends that the individual

damages of the putative plaintiffs can be determined at the end of the litigation during the claims

process.

Plaintiff misses the point of this litigation.   The Government disputes liability, and

contends that liability does not hinge on those issues which Plaintiff asserts are common to all

tribes.  Additionally, the Government disputes liability regarding payment due, which is an

additional argument.  I agree with the Government that the resolution of a challenge to IHS

policy, or an invalidation of IHS policy, will not automatically provide relief to the entire class.

Individualized issues abound in this case.  Before determining whether any breach of

contract or statutory violation occurred, the Court would need to address presentment and claim

preclusion issues to determine appropriate class plaintiffs, make inquiries into the terms and

conditions of separate contracts and review specific programs in each tribe's direct cost base in

order to determine to what extent, if any, that a tribe's non-IHS funding failed to pay shares of

indirect costs.  IHS argues, and the Court agrees, that such peculiarly individualized entitlement to

specific damages does not support granting class certification.

The nature of this kind of case with individualized contracts does not lend itself to class

litigation.  In Moore Video Distributors, Inc. v. Quest Entertainment, Inc., 823 F.Supp. 1332

(S.D.Miss.,1993), video distributors sued a video supplier, the supplier's officers and the

supplier's alleged successor, alleging breach of contract and tort claims.  The court in that case

denied class certification, with this explanation:

17

> . . . the breach of **individually negotiated contracts** with different terms at different times by a corporate defendant, would pose a situation totally unlike that of the paradigmatic class action suit, a tort action wherein all plaintiffs' claims derive from a single, central act of negligence in the design or manufacture of a mass-marketed product. Individual and differing contract claims even if emanating from a single defendant are rarely appropriate candidates for class certification. "The necessity for individualized proof indicates that a class action is not 'an economical or efficient way of processing the complaints of the proposed class.' " Trevino v. Holly Sugar Corp., 811 F.2d 896, 905 (5th Cir.1987) . . .

823 F.Supp. at 1339 (emphasis added).   While the Zuni case is not a tort case, like Moore Video, it involves individually negotiated contracts.

In a case very similar to the Zuni case, the Eastern District of Oklahoma denied class certification in a case involving ISDA contracts, finding that with the exception of the numerosity requirement, none of the other Rule 23(a) prerequisites were met in the plaintiffs' claims. See, Cherokee Nation v. U.S., 199 F.R.D. 357, 363 (E.D.Okla 2001) ("Cherokee").  Like the case at bar, the annual funding agreements in Cherokee were not the same for every tribe.  199 F.R.D. at 363.  In its commonality analysis, the Cherokee court stated, succinctly and aptly:

> The court finds the issue of determining entitlement to "full" contract support costs for each tribes contract for each year in question is the primary focus of this litigation. To determine entitlement to "full" contract support costs, a detailed examination into the contracts of each plaintiff for each year with the defendant would be required. The court believes the individualized nature of the contracts in question would necessarily lead to individualized claims of each tribe in respect to shortfalls. This examination would develop into a set of mini-trials which would defeat the judicial efficiency which a class action is designed to promote. Falcon at 156, 102 S.Ct. 2364. Consequently, the court finds the questions peculiar to individual members of the class predominates over questions of law or fact that are common to the class members. Accordingly, the court finds plaintiffs have failed to meet their burden of commonality.

199 F.R.D. at 363.

Prior to the hearing in this case, Plaintiff submitted additional authority, Dukes v. Wal-Mart, Inc., 474 F.3d 1214 (9th Cir. 2007), a case which affirmed class certification of a Title

18

VII action by female employees against Wal-Mart.  The Dukes court held that Rule 23(a)'s

prerequisites were met, finding that Wal-Mart's decision to permit its managers to utilize

subjectivity in interpreting pay and promotion policies could support a commonality finding. The

court also found that the claims were sufficiently typical to satisfy Rule 23(a)(3) because the

discrimination the plaintiffs allegedly suffered occurred through an alleged common practice, e.g.,

excessively subjective decision-making in a corporate culture of uniformity and gender

stereotyping.

        The Dukes case might be more helpful if the Zuni case was a discrimination case.  The

factual and legal issues in Dukes are distinguishable from Zuni.  First, despite Plaintiff's

contentions, the Zuni case is not premised on a challenge to IHS policy.  The validity of the

Circulars as a guide to calculate contract support costs would not dispose of the liability issues

which span several years, and which are based on different legal theories and numerous individual

tribal contracts.  Also, the plaintiffs in Dukes sought to certify the class under Rule 23(b)(2),

which requires a movant to show that "the party opposing the class has acted or refused to act on

grounds generally applicable to the class, thereby making appropriate final injunctive relief or

corresponding declaratory relief."  This sets forth an entirely different standard from the Rule

23(b)(3) standard under which Plaintiff seeks certification, which requires courts to find that

common issues predominate over individual ones, and that a class action is superior to other

available methods for the fair and efficient adjudication of the controversy.  Thus, Dukes provides

no guidance on the predominance and case manageability issues which the Court must address

here.  Further, the claims presented in Dukes were not subject to a mandatory exhaustion scheme,

unlike the Zuni claims, and thus the jurisdictional barriers to class certification were not present in

Dukes.  Accordingly, I find that Plaintiff has failed to meet its burden of satisfying the commonality requirement of Rule 23(a)(2).

C.     Typicality

Under Rule 23(a)(3), the claims or defenses of the representative party must be typical of the class.  "Differing fact situations of class members do not defeat typicality under Rule 23(a)(3) so long as the claims of the class representative and class members are based on the same legal or remedial theory." Adamson v. Bowen, 855 F.2d 668, 676 (10th Cir. 1988); Taco Bell, 184 F.R.D. at 360. See also Ditty,182 F.R.D. at 642 (named plaintiff's claim is typical if it arises from "the same event or practice or course of conduct that gives rise to the claims of other class members and [is] based on the same legal theory").   Thus, the conduct alleged by Plaintiff and the legal theory it advances needs to be shared by other class members in order to meet the typicality requirement.

Plaintiff contends that it was treated identically to other tribal contractors in that Plaintiff was denied IHS-calculated contract support costs requirements pursuant to the IHS's written policy not to pay such requirements.  In other words, Plaintiff's contention is that it was underpaid for the same reason that other class members were underpaid.

The Government, however, disputes Plaintiff's contention that its contract underpayment claim constitutes a typical course of conduct by IHS.  The terms and conditions of the tribal contracts were sufficiently individualized so that the question of whether all tribal contractors were underpaid becomes one of the disputed issues.  Moreover, it is not clear that the Circulars were applied consistently and systemwide.  The Government points out several non-typical aspects of Plaintiff's claims:  Plaintiff has not presented any CDA claims for years after 1998;

20

Plaintiff did not sufficiently present claims related either to the indirect cost rate methodology or direct contract support costs; Plaintiff does not have an indirect cost rate for any year after 2003, and has been using an out of date indirect cost rate which has resulted in what the Government describes as both over- and under-recoveries of indirect costs from various federal agencies. These characteristics run counter to Plaintiff's argument that its claims are typical of claims of other tribes. The Court rejects Plaintiff's contentions that these characteristics are not relevant to the typicality analysis. They go to the heart of the liability issues, and will eventually have to be sorted out from the tribal contracts entered into by other tribes.

In an attempt to meet Rule 23(a)(3)'s requirement, Plaintiff describes the contracts in overly broad terms and cites to Ditty v. Check Rite, Ltd. 182 F.R.D. 639, 642 (D.Utah,1998) as justification for doing so. However, in Ditty, each plaintiff shared a very specific "covenant not to sue" letter which was central to the basis for the lawsuit alleging a violation of the Fair Debt Collection Practices.

The sole "typicality" in the instant case appears to be negotiations of tribal contracts with IHS. However, because of the different terms and conditions in these contracts, indirect contract support costs that were separately negotiated and different payouts by IHS, I cannot reach the conclusion that the Plaintiff's claims and the proposed class claims are based on the same legal or remedial theory.

Further, I find that the Plaintiff's interests are antagonistic to those of the members of the proposed class. In the Cherokee case, the court found that the typicality requirement was not met because each contract was specific and individual to each tribe, and "there could be a variety of different legal and remedial theories for each tribe, dependent on its contractual terms." 199

21

F.R.D. at 364.  The <u>Cherokee</u> court also made the alternative finding regarding typicality that the named plaintiff's interest was "antagonistic" to the interests of putative class members because the agency would be required to reimburse money from limited appropriations in order to refund the Judgment Fund, under 41 U.S.C.A. § 612(c):

> Thus, the Indian Health Services would still have to take money from their limited appropriations in order to refund the Judgement Fund. As a result, it would be [sic] still be taking funds away from the programs of other potential class member tribes.
>
> It is clear that the named plaintiffs have financial incentive to pursue their own claims, but because of the nature of a limited amount of money available to pay these claims, the court fails to see how the named plaintiffs have any incentive to vigorously pursue the claims of the proposed class members. It seems to this court each tribe has a great interest in individual litigation to aggressively protect and defend their interest under their individual contracts. The court cannot be assured that the plaintiffs, as representative class members, will aggressively pursue the claims of all proposed class members because of their own possible financial interest. The court simply cannot see how the interests of the plaintiffs are not antagonistic to the proposed members of the class.

199 F.R.D. at 365.

The <u>Zuni</u> case involves both Cap Year and Lump Sum claims.  Agencies such as IHS have limited appropriations to spread out among tribes.  It is clear that a higher award for one tribe could mean a lower award for others.  As the <u>Cherokee</u> court noted, "[t]he only logical conclusion which can be reached is that as a result of one plaintiffs' claim less money for other tribes will be available."  199 F.R.D. at 365.  I conclude that the interests of Plaintiff are antagonistic to the interests of the proposed members of the class, for the same reasons.

Plaintiff challenges this conclusion by noting that IHS has never reimbursed the Judgment Fund.  Whether or not the IHS has ever actually reimbursed the Fund (IHS claims there are ongoing disputes concerning which agency should be responsible for the reimbursement) does not

vitiate the mandate that reimbursement is required under 41 U.S.C.A. § 612(c).

Plaintiff attempts to distinguish the <u>Cherokee</u> case by arguing that the Court's commonality ruling against plaintiffs in that case was error because it was collapsed into the "predominance" inquiry.  Regardless of whether this occurred, Plaintiff would still have to meet the predominance prerequisite at some point in the analysis, and it fails to do so as explained below.  Plaintiff also contends that the typicality ruling was wrong because the court merely speculated that there could be different legal and remedial theories for each tribe.  However, the court's ruling in <u>Cherokee</u> was actually based on the individuality of the contracts in their contractual terms.[7]  Plaintiff contends that the predominance ruling in <u>Cherokee</u> was in error because the court mischaracterized the action as being more contract than statutory.  However, because the ISDA statute was the vehicle for presenting the plaintiffs' contract claims, the court did not mischaracterize the action.

Accordingly, because Plaintiff failed to show that its claims and the proposed class claims are based on the same legal or remedial theory, and because of the conflicts of interest that exist among class members, I conclude that Plaintiff has failed to meet its burden of proof as to typicality required by Rule 23(a)(3).

D.    <u>Fair and Adequate Representation</u>

Rule 24(a)(4) requires that the representative party must fairly and adequately represent the interests of the class.  There are two aspects of adequate representation, that of the named class representative and that of class counsel. <u>Queen Uno Ltd. Partnership v. Coeur D'Alene</u>

---

[7]  <u>See</u>, 199 F.R.D. at 364 ("It appears there could be a variety of different legal and remedial theories for each tribe, dependent on its contractual terms").

Mines Corp., 183 F.R.D. 687, 694 (D.Colo.,1998). Adequacy of representation will be found where the named plaintiffs have no antagonistic or conflicting interests with those of the class and where class counsel is qualified, experienced and able to conduct the proposed litigation. Adequacy of representation is unique in that it has a constitutional dimension, "since it would violate due process to bind a class member to a ruling against inadequate class representatives." Id.

I can and will dispense summarily with the latter prong of the prerequisite which concerns the adequacy of class counsel's qualifications and experience.  Except for Mr. Gross and Mr. Gallegos, who have filed what I consider to be nothing more than a self-serving motion requesting creation of a sub-class and appointment of themselves as counsel for that sub-class, neither the Court nor any other party in this case takes issue with the level of skill and competency on the part of Plaintiff's counsel.  There is no question that the legal counsel currently representing Plaintiff are qualified to lead the class action on behalf of the Plaintiff and other class members if a class was to be certified.  I will further state the quality of the written and oral submissions by the lawyers representing Plaintiff  has been superb, as has the quality of written and oral submissions made by the Government's lawyers.

As for the first prong of the fair and adequate inquiry, I find that Plaintiff has not satisfied this requirement.  Plaintiff argues that it has no conflicts of interest with other tribes in the potential class.   As noted earlier, Plaintiff's interests are inapposite to the interests of potential members of the class.  As the court noted in the Cherokee case, it is difficult, if not impossible, "to see how the named Plaintiff can vigorously pursue and protect the claims of potential class members when it could be to their financial detriment."  199 F.R.D. at 366.  Accordingly, I find

that Plaintiff failed to meet its burden of proof in regard to the Rule 23(a)(4) requirement that it adequately represent the interests of all potential class members.

## III.     Class Certification: Rule 23(b) Requirements

In addition to satisfying the Rule 23(a) prerequisites,  Plaintiff must also meet one of the requirements of Rule 23(b) in order for the class action to be maintainable.  The Rule 23(b) requirement that Plaintiff claims it meets is Rule 23(b), which requires that a Court must find that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

The matters pertinent to the findings under Rule 23(b) include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

A.     <u>Predominance</u>

Predominance involves an inquiry into whether there is "material variation" in the defendant's posture toward the different plaintiffs.  <u>Ditty</u>, 182 F.R.D. at 643.  Plaintiff  again relies on the use of the Circulars to meet the predominance requirement, contending that the basic claims are identical because higher amounts of contract support costs would have been paid were it not for the Circulars.  Plaintiff argues that different amounts of contract support costs amounts owed to different tribal contractors should not defeat the predominance requirement.  The Court

has already rejected this argument because it minimizes the contract amounts allegedly owed to an

issue of damages calculations, instead of recognizing the issue as one of liability.  I agree with the

analysis used by the court in  Zapata v. IBP, Inc., 167 F.R.D. 147, 166 (D.Kan. 1996) in noting

the role of damages computation when determining whether certifying a class action was

appropriate:

> [I]f the computation of damages following a ruling in favor of the class is a largely
> mechanical task, then "the existence of individualized claims for damages seems to offer
> no barrier to class certification . . ." Zapata, 167 F.R.D. at 166 (citing Windham v.
> American Brands, Inc., 565 F.2d 59, 68 (4th Cir.1977), cert. denied, 435 U.S. 968
> (1978)).  However, if the computation of damages will require separate "mini-trials," then
> the individualized damages determination predominates over common issues, and a class
> should not be certified." Id. at 68. citing Windham, 565 F.2d at 68). . . In the instant case,
> we conclude that should [Defendant] be found liable on the hostile work environment
> claim, each individual plaintiff would need to present evidence regarding his or her claim
> of compensatory damages. . .  Plaintiffs' claims are highly individualistic, inasmuch as the
> precise relief which this court would grant to each successful plaintiff depends upon a
> number of factors and characteristics specific to each particular plaintiff. . . . (citation
> omitted). Consequently, the damages computation would require separate "mini-trials,"
> where individual damages determinations would predominate over common issues.

167 F.R.D. at 166

The Zuni case involves hundreds of tribal contracts with different terms and conditions,

based on negotiations that took place between numerous tribes and the Government.  I have the

same concerns that were expressed in Zapata regarding the necessity of mini-trials on various

issues.

The use of the Circulars as a guide to calculate contract support costs for some of the

tribes does not meet the requirement that questions of law or fact common to the members of the

class **predominate** over questions affecting only individual members.  The contracts, which are

common to all putative class members, differ with regard to whether the Circulars were used to

calculate the contract support costs, and with regard to the terms and conditions contained in the

contracts. Because the contracts were negotiated separately, the defenses raised by the IHS are

not common to all the putative class members, as discussed earlier. The lack of a single common

defense is the reason why certain cases, on which Plaintiff relies in its reply, are inapposite. See,

e.g.., In re Visa Check/MasterMoney Antitrust Litigation, 280 F.3d 124 (2d Cir. 2001); In Waste

Management Holdings, Inc. v. Mowbray, 208 F.3d 288, 296 (1st Cir. 2000); and In re Agent

Orange Product Liability Litigation, 818 F.2d 145 (2d Cir. 1987). In these cases, the defense or

defenses raised are common to the class such that the success of the defense would foreclose and

dispense with all of plaintiffs' claims. As the Government correctly argues, the individuality of the

tribal contracts of the putative class members precludes an application of a common defense.

I conclude that common questions of law or fact do not predominate among the putative

class members. The use of the Circulars may be common to a significant number of tribes, but

what predominates here are separate and individual contracts with different terms and conditions

and different defenses pertaining to what is allegedly owed in contract support costs.

B.     Superiority

Plaintiff claims that the high cost of litigation would discourage some tribes from engaging

in litigation, and that class certification would reduce each class member's overall costs. Plaintiff

also points to the trust responsibility the Government has to protect and promote the interests of

tribes. However, as the Government points out, individual lawsuits have already been filed,

demonstrating that a sufficient number of the putative class members are sufficiently motivated to

pursue individual lawsuits. The Government's trust responsibility does not extend to making

concessions toward tribes that are not legally sound such as stipulating to class certification for a

putative class that does not meet Rule 23 requirements.

Plaintiff argues that, based on the wide geographic scope of tribes which have entered into ISDA contracts with the IHS, it is desirable to concentrate the litigation of claims in this forum. The Court does not place much stock in this contention.  As the United States Supreme Court stated in Califano v. Yamasaki, 442 U.S. 682, 702 (1979), "[i]t often will be preferable to allow several courts to pass on a given class claim in order to gain the benefit of adjudication by different courts in different factual contexts." Id., at 702-03; see also, U.S. v. Mendoza, 464 U.S. 154, 160 (1984) (the law benefits from having multiple courts of appeals rule on an issue before it comes to the Supreme Court).

Finally, the Court notes the difficulties that would be encountered in the management of such a class action.  Even if the putative class description is narrowed, mini-trials would be required first on numerous threshold issues such as exhaustion, which types of claims were being litigated for each tribe and what fiscal years are represented by the claims for each tribe; the significance of releases signed by some tribes; and collateral estoppel issues.  Some of these issues could preclude litigation of certain claims.  Following these issues, another set of mini-trials would be required on  the contracts that proceed to litigation, based on the individual terms and condition in each of the contracts; the separate negotiations that took place between tribal contractors and IHS (which would include whether an indirect cost rate was applied at all and how the Circulars were applied, if at all, in the negotiations); contract support costs amounts that were agreed on by the parties; amounts paid out under the contracts; whether amounts are owed under each of the contracts; and finally, what amounts are owed.

The specter of mini-trials is relevant to the superiority question as well as the

28

predominance question. See, Castano v. American Tobacco Co. 84 F.3d 734, 745 n.19 (5th Cir. 1996) ( "The greater the number of individual issues, the less likely superiority can be established").  Because there are a  number of separate issues that would need to be litigated in this action for the claims of the class members, class action is not a superior method of adjudication in this case.

**IV.     Motion to Create Sub-Class and Appointment of Counsel to Sub-Class**

The denial of class certification renders moot the Motion to Create Sub-Class and Appointment of Counsel to Sub-Class filed by Mr. Gross and Mr. Gallegos.  In the event, however, of an appeal by Plaintiff which results in the reversal of my decision denying class certification, I believe some additional comments about the motion to create a sub-class are in order.  Mr. Gross and Mr. Gallegos are prominent New Mexico lawyers who have extensive experience in class action litigation that extends well beyond the boundaries of the State of New Mexico.  Mr. Gross and Mr. Gallegos are imminently qualified to represent Plaintiff in this case had they been retained by Plaintiff.  Instead, Plaintiff retained its lawyers who are equally as prominent and experienced in handling class action litigation and equally as qualified to serve as class counsel had a class been certified.  Mr. Gross considers himself to be the brainchild behind a certain type of rate making claim as set forth in his affidavit[8], a notion that is not widely accepted by other counsel in this case.  Notwithstanding Mr. Gross' and Mr. Gallegos' legal qualifications, if I am reversed and class certification is ultimately ordered, I am very confident that Plaintiff's counsel can and will advance any and all claims that should be advanced on behalf of the putative class members.

---

[8] "Applicant Gross. . . has been instrumental in developing the legal theory and litigating the miscalculation of rates used in determining contractors' entitlement to indirect contract support." Doc. 29 at 12.

I previously denied the Motion to Intervene (Doc. 45) and if class certification is ultimately mandated, I see no reason to create any type of sub-class and further complicate what would no doubt be an extremely complicated class action case.  Accordingly, the Court is of the view that Mr. Gross and Mr. Gallegos should litigate the claims on behalf of their clients in the case they filed and in the forum they chose and that is in the United States District Court for the District of Columbia in the case of <u>Tunica-Biloxi Tribe of La. v. United States.</u>

## CONCLUSION

The above captioned case shall not be certified as a class action because the claims of the putative class members do not meet jurisdictional requirements under the Contract Disputes Act, which applies to claims for money damages under the ISDA.

Even if the putative class description is narrowed to allow only class members who have presented all their claims, this case shall not be certified because the putative class does not meet Rule 23(a) requirements for commonality, typicality and fair and adequate representation. The tribal contracts are individual and were individually negotiated; the Government's defenses would differ; and named class representatives' interests could conflict with those of the putative class members.

Additionally, this case does not meet the requirements of Rule 23(b).  Common questions of law or fact do not predominate among the putative class members.  The use of the Circulars may be common to some tribal contractors, but what predominates here are separate and individual contracts with different terms and conditions and different defenses pertaining to what is allegedly owed in contract support costs.  Moreover, class certification is not a superior method of adjudication because it will end up being more cumbersome than efficient.  Mini-trials would

abound on numerous threshold jurisdictional issues, as well as on issues pertaining to the

Government's liability on individual tribal contracts.

**IT IS THEREFORE ORDERED** that Plaintiff's Motion for Class Certification and

Approval of Class Notice (**Doc. 280**) is hereby DENIED for reasons set forth in this

Memorandum Opinion and Order;

**IT IS FURTHER ORDERED** that the Application under Rule 23(g) for Creation of

Sub-Classes and for Appointment as Class Counsel for the Rate-Making Claims, filed by Michael

Gross & J.E. Gallegos (**Doc. 297**) is hereby DENIED as moot.

_____
UNITED STATES DISTRICT JUDGE